UNITED STATES of America,
Plaintiff–Appellee,

v.

Arturo ESTRADA–MACIAS,
Defendant–Appellant.

No. 97–10115

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 18, 1998

Filed July 12, 2000

Matthew C. Bockmon, Assistant Federal Defender, Sacramento, California, for the defendant-appellant.

Richard Pachter, Robin Taylor, Assistant United States Attorneys, Sacramento, California, for the plaintiff-appellee.

Before: CANBY, Jr. and KLEINFELD, Circuit Judges, and KEEP,[1] District Judge.

Opinion by Judge CANBY; Dissent by Judge KEEP

CANBY, Circuit Judge:

Arturo Estrada–Macias appeals his conviction and sentence, after a jury trial, for conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). We need address only one of his contentions: that the evidence was insufficient to support his conviction. We conclude that the evidence was insufficient, and we accordingly reverse Estrada's conviction.

*Background*

There is no doubt in this case that there was a conspiracy to manufacture methamphetamine, and that Estrada lived in the presence of it. The only question, and it is a close one, is whether there was enough

1. The Honorable Judith N. Keep, United States District Judge for the Southern District of California, sitting by designation.

evidence to permit the jury to find that he participated in the conspiracy. The facts are relatively uncomplicated for a drug conspiracy. The key bits of evidence against Estrada were his appearance with other conspirators, his admission of having lived in a trailer found at the manufacturing site, and the materials found in that trailer.

The investigation began when agents of the Drug Enforcement Administration became aware of large, case-lot shipments of pseudoephedrine tablets to various addresses in Stockton, California. The tablets are often used to manufacture methamphetamine. Agents set up surveillance at an address, 908 North San Jose Avenue, in Stockton to which ten cases of tablets were due to be shipped.

Agents first saw a red and white truck that had been driven to the location by co-defendant Ramirez–Vasquez and another Hispanic male whom the agents never identified. A UPS truck then drove up and delivered the ten cases to the two men, who put them in the truck. They then drove in an elusive manner to a K–Mart store, where they purchased propane, also often used in methamphetamine manufacture. The unidentified male then departed in a brown van that had been parked at the K–Mart, while Ramirez drove the red and white truck, with the agents following, to an apartment complex at 641 Park Street in Stockton.

About an hour and a half later, a car arrived which was driven by Antonio Garcia, another conspirator. The car was registered to Jose Ibarra at 1630 North Newport Avenue in Stockton (next door to the conspirators' manufacturing operation). Shortly after arriving, the car departed the apartment complex at 641 Park Street, and was stopped by the DEA agents. Antonio Garcia was driving, and Ricardo Garcia, Ramirez and Estrada, the present appellant, were passengers. The agents questioned Ramirez, who said he had picked up the ten cases of pills for one Linderos, whom he described as the male who had been with him at the time of delivery. The

agents took Ramirez back to the apartment complex at 641 Park Street and he let the agents seize the ten cases of pills from his truck. The agents did not arrest Ramirez at that time.

In their investigation, the agents had learned that another five cases of pills had been delivered on the same day to 1630 Newport, # 2 in Stockton. They were signed for by "Antonio Gar-," which was all that could be read on the UPS receipt.

A few days later, the agents went to find 1630 Newport, # 2, but found no such exact address. There was a house at 1628 Newport, and several apartments behind it numbered 1630, 1632, and 1634. The agents observed evidence of methamphetamine manufacture and obtained a search warrant. In the subsequent search, they found evidence of manufacture at the residence and garage at 1628 Newport and in a small trailer parked in the driveway at that address. The trailer was about twenty feet long and contained one bed, a sink, and some cabinets. It had a pungent odor associated with methamphetamine, and some plastic pails under the bed, one of which contained a package of red phosphorus, a reagent used in converting ephedrine and pseudoephedrine into methamphetamine. Also found in the trailer was a lid with residue of nicotinamide, frequently used as a cutting agent to increase the salable amount of methamphetamine.

Inside the cabinets in the trailer were a plastic pill bottle labeled "ephedrine hydrochloride" and some rags containing and smelling of methamphetamine residue. Finally, in the sink in the trailer, the agents found a torn piece of cardboard paper with calculations on it, including a calculation of "1140x5" to equal "5700." That calculation corresponds to the price of the five boxes delivered to "1630 Newport, # 2," and signed for by "Antonio Gar-." Two hours after that delivery, Garcia and Estrada had been picked up with Ramirez outside the apartment complex at 641 Park Street.

Approximately two weeks later, agents went to another address in Stockton to

interview Ricardo Garcia-one of the passengers, along with Ramirez and Estrada, in the car driven by Antonio Garcia that had been stopped outside the apartment complex at 641 Park Street. They found Estrada and Antonio Garcia at the residence and arrested them both. An INS agent working with the DEA agents interviewed Estrada. Estrada initially stated that he lived in a mission on Sonora Street in Stockton, although he had visited 1628 Newport. Upon further questioning he said that he had been living in the trailer there for the past three months.

At trial, a witness testified that she had helped one Jesus Padilla ship pseudoephedrine pills to 1630 Newport, where he said his friends were making methamphetamine. The witness said that Padilla told her that she could make contact with him by calling a telephone number and asking for "Arturo." Arturo is Estrada's first name, but Estrada called witness Arturo Ortiz Corral, who testified that his telephone number, 941–9118, was listed next to the name "Arturo" in Padilla's address book, which the government had introduced into evidence.

Ramirez was tried with Estrada, and generally held to his story that he had received the pill shipment (as well as an earlier, returned shipment) as a favor for a friend. He testified that he was acquainted with Antonio Garcia, and had agreed to go out with him and the others for a beer (leaving $11,000 dollars worth of pills in his truck) when the agents stopped the car. He stated that he had not met Estrada until that day.

### Discussion

■ In summary, the principal evidence upon which the jury convicted Estrada was the following:

(1) He was with conspirators Antonio Garcia and Ramirez within two hours after each had received a delivery of pills, in different places. He was not present when Ramirez received his shipment, and there is no evidence that he was present when Garcia received his. (2) He lived in a trailer next to the residence used by the conspirators for manufacture, and several items were found in the trailer: containers and rags with residue, and a piece of cardboard paper with calculations for payment of the delivery for which Garcia signed. The conspirators at the house had access to the trailer; a neighbor reported to police that residents of the house frequently entered the garage and the trailer.

(3) Conspirator Padilla told his friend that he could be reached by calling a number and asking for "Arturo." There is another "Arturo" whose number is in Padilla's address book.

(4) Estrada initially stated that he did not live at, but visited, 1628 Newport, but then admitted that he had lived there the past three months.

■ This evidence is certainly sufficient to raise a strong inference that Estrada must have known that several individuals living around him were engaged in a conspiracy to manufacture methamphetamine. That inference is not enough to permit conviction. "Mere casual association with conspiring people is not enough." *United States v. Cloughessy*, 572 F.2d 190, 191 (9th Cir.1977). As the court correctly told Estrada's jury:

Merely being present at the scene of a crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct to find that a defendant committed that crime.

In order to find the defendant guilty of the crime, the government must prove, beyond a reasonable doubt, that in addition to being present or knowing about the crime, the defendants knowingly associated themselves with the crime in some way as participants—persons who wanted the crime to be committed—not as mere spectators.

No rational trier of fact could find that this standard was met for Estrada.[2] The rec-

---

**2.** In determining sufficiency of the evidence, we consider "whether, after viewing the evi-

ord is barren of evidence that he *partici-pated* in the conspiracy. No one testified that he was involved. Estrada was never seen with the ingredients or with the finished product of methamphetamine. He was not present at the delivery of the ten-case shipment of pills and there was no evidence that he was present at the five-case delivery. When he was found in vehicles with some of the conspirators, there is no evidence that there were drugs or precursors in those vehicles at the time. There was no evidence, such as fingerprints, connecting him to the containers found in the trailer. There was no evidence that he maintained control over his quarters; indeed, there was contrary evidence that the residents of the house frequently entered the trailer. There is no evidence that he had any interest in the house, garage or trailer; no utility bills, no written statements.

Under our precedent, Estrada's conviction cannot stand. A comparable case is *United States v. Vasquez–Chan*, 978 F.2d 546 (9th Cir.1992). There a caretaker of a house and a friend staying with her were convicted of possession of cocaine with intent to distribute, and conspiracy so to possess. There were several other conspirators against whom the government had compelling evidence. Neither defendant denied knowing that some 600 kilograms of cocaine was in the house; indeed, it was in the bedroom where the friend was sleeping and her fingerprints were found on six containers and one inside cover of a container. The electric bills of the house were in the caretaker's name. She had lived there for three months and her friend for a few weeks.

On that record, we held that neither defendant could stand convicted of either possession, or aiding and abetting possession, or conspiracy to possess the cocaine. "While the government submitted more than enough evidence that a narcotics conspiracy existed among several individuals

other than Gaxiola and Vasquez, the evidence does not establish that the defendants here agreed to or knowingly assisted that conspiracy." *Id.* at 553.

■ The same can be said about Estrada. The government makes much of the fact that Estrada initially denied living in the trailer, although he said that he visited the area; later in the same interview he said that he had lived in the trailer the last three months. The government argues that the initial denial is evidence of guilt. The problem with this argument is that Estrada must have known that a drug manufacturing conspiracy was taking place all around his living quarters. A first instinct to deny residence is not inconsistent with such innocent knowledge, especially when it was quickly corrected. The denial is as consistent with non-participating knowledge as it is with complicity. "When there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one." *Id.* at 549. In Estrada's case, as in *Vasquez–Chan*, the government produced no such evidence.

Another illustrative case is *United States v. Bautista–Avila*, 6 F.3d 1360 (9th Cir.1993). There we held to be insufficient stronger evidence than the government presented against Estrada. In *Bautista–Avila*, two defendants had entered the United States from Mexico in a vehicle one minute apart from a Ford Granada vehicle containing cocaine, and had driven to a motel and parked next to the Granada. A conspirator retrieved the keys to the Granada from the room in which the two defendants were staying. One conspirator later confessed that both cars were involved in the conspiracy, and that he had given one defendant $5,000 cash, which the

dence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime be-

yond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).'

defendant had hidden in his vehicle. On this evidence, we overturned the conviction of the two defendants. We acknowledged that their behavior was "consistent with that of people tangentially involved in a drug conspiracy. However, their behavior is also consistent with that of people who are unwittingly associating with individuals in a drug conspiracy." *Id.* at 1363. Their handling of the money was not sufficient; there was no evidence that they knew the money was involved in a drug conspiracy (one defendant had said that they entered the United States to buy a truck). *See id.*

The government here argues that the piece of torn cardboard, with calculations written on it, found in the sink of the trailer is highly incriminating. That it is, but there is no evidence connecting Estrada with the cardboard. By far the most likely supposition is that the calculations were made by Antonio Garcia, when he received the five-case shipment and paid for it; his name, "Antonio Gar-," was on the UPS receipt. In *United States v. Ramirez,* 880 F.2d 236 (9th Cir.1989), we overturned the conviction of the defendant Ramirez, who was arrested during a search of a residence where drugs were found. In a dresser in one bedroom, there was an envelope addressed to Ramirez and a drug ledger (another ledger was found in another room). We noted that "[t]here was no evidence connecting the drug ledgers with [Ramirez]. The government, indeed, made no effort to show by handwriting or by fingerprints that he had any connection with the ledgers." *Id.* at 238. The same condition exists here.

The remaining facts of *Ramirez* are also instructive. Ramirez's mother lived in the house, and there was testimony that Ramirez lived elsewhere but had stayed in the house the night before the search. He was encountered by the searching agents as he exited the master bathroom in which there were plastic bags, tape, scissors, a knife, a triple-beam scale, and a jar containing heroin. He had a rolled-up $20 bill in his pocket with cocaine traces on it, along with some plastic bags. We held, however, that there was insufficient evidence to convict Ramirez of conspiracy to distribute cocaine.

The one evidence of drug trafficking that Ramirez could not have missed, according to the government's witnesses, was the scales that could have been used to measure cocaine. But it is a great leap to conclude that a son who knows that there are such scales in the bathroom used by his mother and step-father has therefore possessed cocaine or heroin with intent to distribute or has agreed to distribute cocaine.

*Id.* at 238; *see also United States v. Penagos,* 823 F.2d 346, 349–50 (9th Cir.1987) (presence of defendant at time of cocaine delivery and possible actions as lookout insufficient to convict of conspiracy or possession with intent to distribute).

These cases make it clear that the conviction against Estrada cannot stand. The government offers no contrary precedent close to Estrada's case. The government argues that the jury was properly instructed that mere presence or knowledge of a conspiracy is not enough to convict, and yet it convicted. But the giving of the instruction, however proper in such drug conspiracy cases, is no substitute for evidence. If it is conceded, as it must be under the cases we have discussed, that it is possible for a person to be present at the location of a drug manufacturing conspiracy, and know of it, and yet remain innocent, then Estrada's conviction cannot stand. The government produced no evidence beyond that which permits an inference that Estrada was present near the manufacturing site and must have known that manufacture was occurring. Nothing was offered to permit the jury to find beyond a reasonable doubt that Estrada *participated* in the conspiracy. We therefore reverse his conviction.

**REVERSED.**

KEEP, District Judge, Dissenting:

I dissent. The issue is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). I conclude that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

The lynchpin of the majority's holding is a secondary hearsay statement by Jose Ibarra, who did not testify, to an unnamed agent, who also did not testify. Rather, Agent John Scarlett testified. Agent Scarlett was with the unnamed agent when the statement was allegedly made by Ibarra. The testifying officer, Agent Scarlett, had no independent recollection of the statement or even of the interview of Ibarra, and defense counsel for co-defendant Carlos Ramirez used the report of the unnamed agent to bring out Ibarra's statement. However, no foundation was laid that Agent Scarlett had reviewed this report at a time when the events were fresh in his mind and that he found the account of events accurate. Under the circumstances, how can we say that the statements of Ibarra to the unnamed agent regarding Ibarra's account that "the residents of the house at 1628 Newport would regularly be observed going into the trailer and the garage" and that "the residence of 1628 Newport had control over the garage located on the property as well as the small trailer," R.T., Vol. III, at 407, raised a reasonable doubt about Estrada's dominion and control of the small trailer? Mandating the jury's reliance on Ibarra's account is even more problematic because the hearsay statement is not specific as to the dates the residents of the house were seen regularly entering the small trailer, nor does it exclude the fact that Estrada was with them or in the trailer during those visits. Also, the statements do not indicate whom Ibarra believes the residents of the house at 1628 Newport to be, indeed one of whom could be Estrada himself. The basis of Ibarra's knowledge is unknown, and the accuracy was untested by cross-examination before the jury.

Without that flimsy double hearsay statement, there is evidence that:

(1) Estrada was found with conspirators Antonio Garcia and co-defendant Carlos Ramirez within two hours after each had received a delivery of boxes of pseudoephedrine pills, in two separate locations;

(2) The trailer in which Estrada lived was small (20 feet long) and was parked within three feet of the shed and garage in which methamphetamine appears to have been manufactured;

(3) Estrada initially lied about living in the small trailer, but later testified that he "lived in a trailer that was behind 1628 Newport address, and that he lived there for three months and *that he had access to the house,*" R.T., Vol. II, at 225, the very house which also contained methamphetamine manufacturing equipment;

(4) According to forensic chemist, Roger Ely, the whole trailer had a pungent smell of the methamphetamine precursor chemicals located in the trailer, and at one point, there may have been a possible methamphetamine laboratory in the trailer. R.T., Vol. II, at 325–26.

(5) Seized from the trailer were several items: (1) under the bed, two plastic pails, one of which contained red powder residue, and the other which contained a large plastic bag with red phosphorous powder, (2) a black lid with white powder residue of nicotinamide, a cutting agent to increase the salable amount of methamphetamine, (3) inside a cabinet over the stove, a plastic pill bottle labeled "ephedrine hydrochloride," (4) inside a cabinet by the bed, some rags containing and smelling of methamphetamine residue, and (5) in the sink, a torn piece of cardboard paper with writing in red ink, containing the calculation on it of "1140 X 5" to equal "5700," corresponding to the price of the five boxes of pseudoephedrine delivered to "1630 Newport, # 2" and signed for by "Antonio Gar-."

Viewing this evidence in light most favorable to the prosecution, which we must do, this is sufficient to uphold the finding of the jury.