**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Gerardo HERRERA–GONZALEZ,**
**Defendant–Appellant.**

**No. 99–10504.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 11, 2000

Filed Sept. 5, 2001

**64.** *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Bran-   deis, J. dissenting).

Anthony P. Capozzi, Fresno, California, for the appellant.

Thomas E. Flynn (briefed), Assistant United States Attorney, Sacramento, California, and Kathleen A. Servatius (argued), Assistant United States Attorney, Fresno, California, for the appellee.

Before: KLEINFELD, HAWKINS, and TALLMAN, Circuit Judges.

KLEINFELD, Circuit Judge:

This is a drug conspiracy case in which the main issue is sufficiency of evidence of participation in the conspiracy.

## I. FACTS

This case was tried and the jury convicted. We therefore report the facts based on the evidence introduced at trial.

Herrera–Gonzalez was apprehended at a ranch where methamphetamine was being manufactured. The evidence established overwhelmingly that several people were acting together to manufacture large quantities of methamphetamine. But he testified that he did not know about the methamphetamine and that he did not help in its manufacture. The jury was required to determine whether Herrera–Gonzalez knew what the others at the ranch were doing and intentionally participated in their conspiracy, or whether he just had the misfortune of being there when the arrest took place.

The methamphetamine laboratory was concealed behind stacked bales of hay in the center of a barn. Herrera–Gonzalez, twenty-two years old at trial and about twenty when the events occurred, took the stand. He testified that he had never been in the part of the barn where the manufacturing took place, did not know the hidden area was there, and had never been to the ranch prior to the day before

the arrest. He had met one of the co-conspirators at a family gathering and had stayed at his house (off the ranch) for a couple of days because the man said he would try to get him a job doing farm work despite Herrera–Gonzalez's immigration and documentation difficulties. When he first came to the ranch, the day before the arrest, he helped an older man feed the cows, goats, ostriches and other animals, tried to shear a sheep, and stayed overnight on the expectation that the owner would be there the next day and would talk to him about the job. When the police arrived, a co-conspirator who was with Herrera–Gonzalez ran away, but Herrera–Gonzalez did not. His fingerprints were not found on anything in the methamphetamine laboratory. His clothes and shoes were tested and had no chemicals on them from anything in the laboratory. This evidence made out a good case for acquittal.

On the other hand, the jury did not have to believe anything Herrera–Gonzalez said. The government presented evidence from which the jury could infer that Herrera–Gonzalez knew what was going on and was actively participating. In particular, his story that he had never stayed at the ranch before, and that his contact with the other conspirators began just a couple of days before the arrest, was strongly impeached. At the home of Herrera–Gonzalez and his wife, in another town, a phone bill was found for the house (away from the ranch) where some of the conspirators were staying, and where Herrera–Gonzalez testified that he had stayed for just a couple of days. A feed store clerk testified that Herrera–Gonzalez and a co-conspirator had been physically present together in his feed store, and had purchased a hundred bales of hay for delivery to the ranch. This purchase occurred two months before the arrest. If the jury chose to believe the feed store clerk's testimony (as opposed to that of Herrera–Gonzalez), then Herrera–Gonzalez was associated with the conspira-

tors long before he testified that he met them. The phone bill at his house supported that inference.

When a volunteer fireman showed up after seeing smoke, he yelled to Herrera–Gonzalez and another man that their shed was on fire, but the two men seemed unalarmed. They spoke Spanish to each other and Herrera–Gonzalez told the fireman that there was no fire, and that they were just cooking feed for their cattle. This made the volunteer fireman suspicious because, in his twenty years experience in the area, people did not cook cattle feed, so he contacted the fire department and the police. Herrera–Gonzalez testified that the suspicious statement about cooking cattle feed was the other man's story, not his, and he was just repeating in English what the conspirator told him in Spanish.

When the police and additional firemen arrived, Herrera–Gonzalez told one of the conspirators' wives to take her son to school even though it was an hour too early for school. She told him it was too early, and Herrera–Gonzalez replied that he knew what he was saying. At trial, Herrera–Gonzalez denied making these statements.

The child's mother testified that Herrera–Gonzalez told her to keep her son inside because "they were going to make some medicine for the flies" and it might hurt the child. The child testified that Herrera–Gonzalez had told him just before the firemen came not to go into the barn, because he would get sick, but Herrera–Gonzalez testified that he had not said this to the child. The child and his mother testified that the day before the arrest was not Herrera–Gonzalez's first time at the ranch as he testified, but that he had been there before.

After the arrests, when the four alleged conspirators were in jail, Herrera–Gonzalez had his wife purchase $40 money or-

ders for each of the four men arrested. The money was for jail commissary purchases, such as toiletries. The government used this to suggest a financial relationship among the four.

The jury found Herrera–Gonzalez guilty of conspiring to manufacture methamphetamine and attempting to manufacture methamphetamine under 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.

## II.  ANALYSIS

A.  Sufficiency of evidence.

■  Herrera–Gonzalez challenges whether the evidence was sufficient to convict him of either of the two crimes. For both, he argues that the evidence proved only his presence where the crime was committed, not his knowing and intentional participation. We review sufficiency of evidence challenges to determine whether "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [1]

■  In a "mere presence" or "hanging around" case, the question is whether there is enough evidence to tie the defendant to the criminal activities. It is not a crime to be acquainted with criminals or to be physically present when they are committing crimes.[2] Imprudent, certainly, because of the legal risk of being mistaken for a co-conspirator, but not criminal. Even living in the same house as the criminals, or living in a room where drugs are stored, is by itself insufficient evidence of conspiracy.[3] Although once a conspiracy is established only a slight connection to the conspiracy is necessary to support a conviction,[4] the term "slight connection" in this context does not mean that the government's burden of proving a connection is slight. Innocent association, even if it is knowing, does not amount to a "slight connection." The term "slight connection" means that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details.[5] A connection to the conspiracy may be inferred from circumstantial evidence.[6]

■  The elements of drug conspiracy under the statute at issue are: (1) an agreement to accomplish an illegal objective, and (2) the intent to commit the underlying offense.[7] "[T]he criminal agreement itself is the *actus reus*." [8] In this

---

**1.** *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Estrada–Macias,* 218 F.3d 1064, 1066 n. 2 (9th Cir.2000).

**2.** *See Estrada–Macias,* 218 F.3d at 1066. *See also United States v. Vaughan,* 718 F.2d 332, 333–34 & n. 5 (9th Cir.1983); *United States v. Cloughessy,* 572 F.2d 190, 191 (9th Cir.1977).

**3.** *See Estrada–Macias,* 218 F.3d at 1066; *United States v. Vasquez–Chan,* 978 F.2d 546, 551 (9th Cir.1992); *United States v. Ocampo,* 937 F.2d 485, 489 (9th Cir.1991).

**4.** *See United States v. Castaneda,* 16 F.3d 1504, 1510 (9th Cir.1994); *United States v. Sanchez–Mata,* 925 F.2d 1166, 1167 (9th Cir. 1991).

**5.** *See United States v. Strickland,* 245 F.3d 368, 385 (4th Cir.2001); *United States v. Burgos,* 94 F.3d 849, 861 (4th Cir.1996).

**6.** *See United States v. Mares,* 940 F.2d 455, 458 (9th Cir.1991).

**7.** *See United States v. Shabani,* 513 U.S. 10, 16, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) (eliminating requirement of an overt act); *United States v. Yossunthorn,* 167 F.3d 1267 (9th Cir.1999); *United States v. Iriarte–Ortega,* 113 F.3d 1022, 1024 (9th Cir.1997), *amended on other ground by* 127 F.3d 1200 (9th Cir. 1997), *cert. denied* 523 U.S. 1012, 118 S.Ct. 1209, 140 L.Ed.2d 330 (1998); *United States v. Mesa–Farias,* 53 F.3d 258, 260 (9th Cir. 1995).

**8.** *Shabani,* 513 U.S. at 16, 115 S.Ct. 382.

case it is undisputed that a conspiracy to manufacture methamphetamine existed. The only real issues are whether Herrera–Gonzalez was part of the conspiracy and whether he intended to further it.

The second count of conviction was for aiding and abetting in the attempted manufacture of methamphetamine.[9] His argument on appeal is essentially the same as on the conspiracy count; the government proved no more than mere presence at a place where others were committing the crime.

Herrera–Gonzalez argues that his case cannot be fairly distinguished from five cases in which we have held that the evidence showed only "mere presence" and was insufficient as a matter of law to support the convictions. The five cases are *United States v. Lennick,*[10] *United States v. Sanchez–Mata,*[11] *United States v. Ocampo,*[12] *United States v. Vasquez–Chan,*[13] and *United States v. Estrada–Macias.*[14]

In *Sanchez–Mata,* the defendant's conduct was as consistent with his being an innocent man caught with guilty friends as with his being a conspirator.[15] Government agents had repeatedly linked a particular automobile with a cache of marijuana hidden in the desert, but Sanchez–Mata was never seen in the remote desert area where the drugs were located.[16] There was no evidence whatsoever of his participation in the drug operation except that on the day of the arrest, he was a passenger in a car which reeked of marijuana and sped away from the police at ninety-five miles per hour.[17] The case stands for the proposition that conduct as consistent with innocence as guilt, and knowledge that drugs are present, will not suffice to establish a connection to a conspiracy. The prosecution made much of Sanchez–Mata's demeanor at the arrest because he looked nervous and looked at the driver, but an innocent person would be as likely as a guilty person to look nervous and look at the driver, if the driver got him into the middle of a drug bust.

*United States v. Ocampo* likewise holds that mere acquaintance with a conspirator, and geographical proximity to drugs, will not suffice to prove even a "slight connection" to a conspiracy. The cocaine in that case was hidden in a secret compartment of a truck in the garage of a condominium where Ocampo may have lived.[18] One of the conspirators had once been seen driving Ocampo to the condominium, and a fingerprint showed that Ocampo had once touched the truck.[19] Ocampo had keys to the condominium, but did not have a key to the truck and did not own it.[20] This evidence was insufficient to show that he controlled the truck or was acting to further the conspiracy.[21]

In *Vasquez–Chan,* we held that the evidence was insufficient to prove conspiracy to possess cocaine because the evidence would not allow reasonable jurors to conclude beyond a reasonable doubt that the

9. 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2.

10. 18 F.3d 814 (9th Cir.1994).

11. 925 F.2d 1166 (9th Cir.1991).

12. 937 F.2d 485 (9th Cir.1991).

13. 978 F.2d 546 (9th Cir.1992).

14. 218 F.3d 1064 (9th Cir.2000).

15. *See Sanchez–Mata,* 925 F.2d at 1168.

16. *See id.* at 1167–68.

17. *See id.* at 1167.

18. *See Ocampo,* 937 F.2d at 488.

19. *See id.*

20. *See id.*

21. *See id.* at 489.

innocent explanation for the conduct was false.[22] The two defendants were, as far as the evidence showed, a caretaker of the house where 600 kilograms of cocaine were kept, and a friend of hers who was staying with her for a few weeks.[23] The evidence showed that they knew the cocaine was there (one of them slept in the bedroom where the drugs were and her fingerprints were on the containers),[24] but it also showed that in the extensive surveillance of the conspirators, the two individuals' names were never mentioned, and these two people were never seen actively participating.[25] The case stands for the proposition that knowingly living in the same house or even the same room with the drugs, as a housekeeper, friend, or house guest, will not suffice as evidence of conspiracy, where there is substantial evidence that the drugs belonged to others and the defendants were never mentioned by the conspirators or otherwise shown to have had any participation.

*Lennick* is not a "mere presence" or "hanging around" case and is not on point. The government successfully proved that the defendant grew marijuana, but charged him with conspiracy as well as manufacture.[26] There was no evidence that anyone else had anything to do with his marijuana growing operation except that he gave and sold marijuana to some people.[27] We held that without an agreement with those people for further distribution, selling to them, even knowing that they would further distribute the drugs, did not establish a conspiracy.[28] *Lennick* is not on point because there was no evidence that a conspiracy existed, but here,

the existence of the conspiracy is unquestioned and it is only the defendant's connection that is at issue.

The last of defendant's citations is to *Estrada–Macias.* In that case, like *Vasquez–Chan,* the defendant was a houseguest sleeping in the same room with the narcotics and must have known about the narcotics conspiracy.[29] But, we emphasized that "the record is barren of evidence that he *participated* in the conspiracy." [30] Though he lied initially, before quickly correcting himself, by denying that he slept in the trailer, we held that while he "must have known that a drug manufacturing conspiracy was taking place all around his living quarters," his "denial [wa]s as consistent with non-participating knowledge as it [wa]s with complicity." [31] The case stands for the previously established proposition that presence at the location of a drug conspiracy, and knowing that the drug conspiracy is taking place, is insufficient evidence of a connection with the conspiracy, in the absence of any evidence of participation.

Our cases have established that presence at the location of a conspiracy's activities, while the activities are taking place, knowing that they are taking place, without proof of intentional participation in the conspiracy, cannot support a conspiracy conviction. It is extremely imprudent to remain knowingly in the presence of an ongoing criminal conspiracy, but imprudence is not a crime. Sometimes youthful inexperience and lack of common sense, impecuniousness, or personal relationships may bring the innocent into continuing

---

22.  *See Vasquez–Chan,* 978 F.2d at 549, 552.

23.  *See id.* at 549.

24.  *See id.* at 550.

25.  *See id.* at 548.

26.  *See Lennick,* 18 F.3d at 818.

27.  *See id.*

28.  *See id.* at 819.

29.  *See Estrada–Macias,* 218 F.3d at 1066.

30.  *Id.* at 1066–67.

31.  *Id.* at 1067.

proximity with the guilty, but our line of "mere presence" cases requires acquittal in the absence of evidence of intentional participation.

 In this case, though, there was evidence of intentional participation. If the feed store witness was not mistaken, Herrera–Gonzalez was there when a large quantity of hay was purchased for the ranch where the methamphetamine was manufactured. This means that Herrera–Gonzalez lied about both whether he was there when the hay was purchased and when his association with the conspirators began. The phone bill tended to prove a longer and deeper financial relationship with the conspiracy than that to which Herrera–Gonzalez testified. If the child witness and his mother were telling the truth, then Herrera–Gonzalez was lying in his testimony about when he first came to the ranch and about his knowledge of what was going on in the barn. The jury could also have concluded that Herrera–Gonzalez was lying when he testified that he was just repeating what the conspirator had said in Spanish when he said they were cooking feed for the cattle. The jury could infer that he himself made up this story because he knew they were cooking methamphetamine and was grasping for a story that would get the fireman to leave. Telling the child's mother that they were making "medicine for the flies" and warning the child to stay out of the barn because he would get sick further established that Herrera–Gonzalez knew they were making methamphetamine in the barn and lied about his ignorance. The evidence of Herrera–Gonzalez's participation in the activities of the conspiracy with knowledge of its criminal activity and an intention to further that activity takes this case out of the "mere presence" line of authority. We are unable to conclude that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [32]

**B. Sentencing.**

 Herrera–Gonzalez makes a number of arguments why his 222–month guideline sentence should have been more lenient. He argues that he should have received a downward adjustment for being only a minor or minimal participant.[33] But the district judge made a factual finding that "he was one of the main participants, because he was going to do the actual manufacturing," and that finding stands under our "clearly erroneous" standard of review.[34] He also argues that the district court should have made downward departures for reduced mental capacity because he was of low intelligence,[35] and on general grounds of justice because co-conspirators got lower sentences (they got adjustments for acceptance of responsibility).[36] We lack jurisdiction to review the district court's discretionary decision not to depart downward.[37]

**AFFIRMED**

**32.** *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Steffen*, 251 F.3d 1273, 1275 (9th Cir.2001).

**33.** U.S.S.G. § 3B1.2.

**34.** *See United States v. Wilson*, 900 F.2d 1350, 1355 (9th Cir.1990).

**35.** U.S.S.G. § 5K2.13.

**36.** U.S.S.G. § 5K2.0.

**37.** *See United States v. Riggins*, 40 F.3d 1055, 1058 (9th Cir.1994).