NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

JAN 14 2022

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Nos. 20-10269, 20-10344 |
| *Plaintiff-Appellant*, | D.C. No. 3:13-cr-00764-WHO-3 |
| v. | |
| BARRY GILTON, a.k.a. PRELL, | MEMORANDUM* |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Northern District of California
William H. Orrick, District Judge, Presiding

Argued and Submitted November 17, 2021
San Francisco, California

Before: WATFORD and FRIEDLAND, Circuit Judges, and KORMAN,** District
Judge.

From an early age, Barry Gilton had a passion for basketball. As he grew

older, he decided he wanted to use this passion to give back to his community—

San Francisco's Fillmore district. Barry thus took a job as the recreational director

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Edward R. Korman, United States District Judge for
the Eastern District of New York, sitting by designation.

1

at Fillmore's Ella Hill Hutch Community Center. There, he took charge of the center's sports programs, counseled children, and helped students with their homework. He also coached the San Francisco Rebels, a youth basketball team.

But there was a dark side to the Fillmore community. The district was dominated by several rival gangs. Central Avenue—the street Barry grew up on—was part of the territory controlled by the Central Divisadero Players ("CDP"). Some, but not all, members of Barry's large and extended family were prominent in CDP. While Barry would infrequently socialize with CDP members at their hangouts, he did not actively involve himself in the gang's affairs nor was he a member.

Indeed, Barry ultimately moved out of the Fillmore neighborhood. He and his partner Lupe Mercado had four children, including a daughter named Leticia. When Leticia was 17 years old, she moved to Los Angeles to get away from the troubles she was having in school. While living with a relative, she became involved with Calvin Sneed, a pimp who lived in Los Angeles and was not associated with CDP or its rivals. Initially under the guise of a romantic relationship, Sneed involved Leticia in prostitution, and later used threats and violence to force her to continue.

After Barry and Lupe learned what Sneed had done, they repeatedly tried to convince Leticia to return to their home in San Francisco. But she refused to

accede to their anxious pleadings. The two of them then attempted to kill Sneed—an attempt that almost succeeded. After that attempt failed, Barry turned, for the first time, to his cousin Antonio Gilton and his friend Alfonzo Williams—both members of CDP—for their assistance in killing Sneed. They succeeded in doing so on June 4, 2012, when Sneed was on his way to pick up Leticia.

The State of California charged Barry and Lupe with murder. But on the eve of their trial, the United States Attorney ("USA") chose to indict them for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Violent Crimes in Aid of Racketeering Act (VICAR). Barry and Lupe then spent between five and six years in federal prison before they were tried. This delay was occasioned by the USA's decision to first try nine members of CDP, four of whom pled guilty.

The jury acquitted Barry and Lupe of the VICAR murder of Sneed, presumably rejecting the argument of the AUSA that they murdered Sneed "for the purpose of gaining entrance to or maintaining or increasing [their] position in" CDP, as required by 18 U.S.C. § 1959(a). Although the jury convicted Barry under RICO of agreeing to conduct the affairs of the CDP enterprise through a pattern of

racketeering, the district court granted Barry's Rule 29 motion for a judgment of acquittal.

The district judge recognized that Barry "undeniably participated in Sneed's murder." Nevertheless, he held that no reasonable factfinder could have found that prior to the murder of Sneed, Barry was a member of CDP or agreed to participate in any of the numerous violent criminal acts in which CDP had engaged. As the able district judge observed: "Over the years of overseeing this case, I have become all too familiar with the heinous acts of violence, pimping, and robberies committed by members of the CDP enterprise. None of that evidence involved Barry Gilton until the time of the Sneed murder." The judge continued: "[T]he Sneed murder had little to do with the CDP enterprise, much less its success." Nor did the evidence allow "a rational inference that Barry Gilton *intended* for CDP's racketeering to continue" after the Sneed murder. This appeal followed.

A review of the record reveals the gaping hole that the district judge identified. Indeed, that deficiency is apparent from the testimony of the prosecution's own witness—J.B.—who testified in exchange for a lower sentence recommendation. J.B. had admittedly been a "member" of CDP. When asked to define that term, he testified that "[t]o be a member of CDP, we would commit

crimes together, such as robbing, shooting, killing, selling drugs, hanging out together, staying with each other."

While J.B. was the kind of a witness who has every incentive to provide testimony that would help the prosecution's case, he did not name Barry as a member of CDP when asked to name members. And more significantly, the AUSA never asked J.B. if Barry had participated in any of the crimes that J.B. described, nor did he ask if Barry was a member of CDP. Moreover, although members of CDP identified themselves through "hand signs, graffiti, tattoos, [and] social media," there was no evidence that Barry did so. In addition to these gaps in the record, significant exonerating evidence was admitted at Barry's trial. After describing each murder committed by CDP members, as well as their participation in robberies, shootouts, and drug and firearm possession, stipulations, which were signed by the AUSAs, contained the following sentence: "*There is no evidence that Barry Gilton or Lupe Mercado participated in any of the incidents in this document.*"

To convict Barry of RICO conspiracy, the prosecution needed to prove that he agreed to "further[] or facilitate[e] the criminal [enterprise's] endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Barry's participation in Sneed's murder to protect his daughter whom Sneed had exploited and abused was insufficient for

any rational juror to conclude that Barry entered into an agreement to further the CDP enterprise.

The other evidence that the USA relies on in the briefing likewise falls short. The testimony of the cooperating witness that Barry's family members were "dominant" in CDP and that the Gilton family was "basically a part of us" are meaningless phrases. Indeed, the cooperating witness acknowledged that not all members of the "big" Gilton family were members of the gang and never named Barry among those who were when he was asked. Barry, who moved out of the neighborhood after he grew up, had infrequent contact with CDP members, although he once attended the funeral of a CDP member murdered by a rival gang. But we have held that:

> It is not a crime to be acquainted with criminals or to be physically present when they are committing crimes. Imprudent, certainly, because of the legal risk of being mistaken for a co-conspirator, but not criminal. Even living in the same house as the criminals, or living in a room where drugs are stored, is by itself insufficient evidence of conspiracy. Although once a conspiracy is established only a slight connection to the conspiracy is necessary to support a conviction, the term "slight connection" in this context does not mean that the government's burden of proving a connection is slight. Innocent association, even if it is knowing, does not amount to a "slight connection."

*United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001) (footnotes omitted). While the "connection to the conspiracy may be inferred from circumstantial evidence," *id.*, the additional evidence is not sufficient. Specifically, Barry was in a few stills of a rap singer's music video—the contents of which were

6

not in evidence. Notably, while some individuals in the stills made hand signs associated with CDP, Barry did not. And the cooperating witness, who left CDP in 2010, testified that Barry had once, perhaps years earlier, discussed purchasing a chain that a CDP member had stolen. But there was no evidence that Barry knew the chain was stolen or that he indeed purchased it.

Because Barry's connection to CDP was "tenuous," the prosecution might have instead shown Barry's intent to further CDP by his involvement in "two predicate acts" of the enterprise. *Salinas*, 522 U.S. at 66. It did not. While Barry's participation in Sneed's common-law murder could qualify as a predicate offense, the prosecution did not present sufficient evidence of Barry's involvement in a second offense. And its argument that his participation in Sneed's murder and its coverup provided a basis to infer Barry's agreement to further the CDP enterprise is based on nothing more than pure speculation. *See Juan H. v. Allen*, 408 F.3d 1262, 1279 (9th Cir. 2005). Indeed, the only reasonable inference to be drawn from the evidence the prosecution presented was that Barry's participation in Sneed's murder was an "isolated event" and not part of a pattern of racketeering activity. *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399 (9th Cir. 1986) (internal quotation marks omitted). Thus, the district court did not err in granting Barry an acquittal.

**AFFIRMED**.